**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

**MISSISSIPPI POWER COMPANY**                                       **PLAINTIFF**

**V.**                                                   **1:03CV763LG-RHW**

**WATER AND POWER TECHNOLOGIES, INC.**                     **DEFENDANT**

**FINDINGS OF FACT AND CONCLUSIONS OF LAW UPON ISSUES
TRIED WITHOUT A JURY PURSUANT TO FED. R. CIV. P. 52**

     THIS CAUSE came before the Court on August 1, 2005, through August 8, 2005, and March 13 through March 15, 2006, for a trial without a jury. The Plaintiff, Mississippi Power Company, seeks damages for breach of contract from the Defendant, Water and Power Technologies, Inc. Defendant filed a counterclaim against the Plaintiff seeking damages for breach of contract. Having considered the testimony, evidence, and the parties' proposed findings of fact and conclusions of law, the undersigned is of the opinion that the Defendant has established that the Plaintiff breached the contract. Therefore, the Defendant is entitled to recover from Plaintiff damages in the amount of $288,648.38, plus a penalty in the amount of $167,693.59 as provided by MISS. CODE ANN. § 87-7-3. The Plaintiff cannot maintain its claims of breach of contract against the Defendant, and thus, MPC's claims must be dismissed with prejudice.

PROCEDURAL HISTORY

     The Plaintiff, Mississippi Power Company, is an electric utility which owns and operates facilities used to generate, transmit and distribute electricity in southeast Mississippi. The MPC facility at issue in this case is Daniel Electric Generating Plant ("Plant Daniel") in Jackson County Mississippi. The Defendant, Water and Power Technologies, Inc., is a Utah corporation engaged in the business of designing and building industrial water filtration systems.

MPC filed its complaint against WPT on September 22, 2003, seeking damages for breach of contract, breach of express warranty, breach of implied warranty of merchantability, and breach of implied warranty of fitness for a particular purpose. WPT filed a counter-claim contending that MPC breached the contract. MPC seeks damages in the amount of $3,295,843.29. WPT seeks damages in the amount of $1,356,678.29, plus interest and a prompt payment penalty, as provided in MISS. CODE ANN. § 87-7-3.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

In the late 1990s, MPC decided to increase its generated electricity capacity. Since the existing water treatment system was insufficient to meet its needs, MPC needed to increase its output of purified water. After considering various water treatment alternatives, MPC decided that the most cost efficient water treatment system would be a three-stage system consisting of an ultrafilter ("UF"), a reverse osmosis system ("RO"), and an ion exchange demineralizer. MPC had never used a UF system; thus, in late 1998, MPC hired WPT to conduct a pilot study. The parties agreed that if the pilot study was successful, then MPC would use a single source bid for the project. In other words, WPT would be the sole bidder for the project.

The pilot study was conducted from December 11, 1998, through May 18, 1999, using the Pascagoula River as the raw water source. The water was pumped from the river to the triangular settling pond ("triangle pond") at Plant Daniel. During the study, the pilot plant failed twice. After the second failure, which was during a time of high turbidity of the water source, WPT took the pilot plant back to Utah for modifications to the system. WPT returned the pilot plant to MPC in April 1999. Netto, the former President and owner of WPT, explained that during a pilot study, the pilot plant should be run under worst case scenario conditions to determine the limits of the system. Despite the two failures of the pilot study, MPC began preparing specifications for the system and a

request for proposal after the pilot study was completed.

Sometime after completion of the pilot study but before MPC issued its request for proposals, John Papania, a Senior Chemist at Plant Daniel, recommended to Al Nebrig[1] and Alan Whitley[2] that the water source for the water treatment plant be changed from the triangle pond to the Plant Daniel cooling pond. Papania knew from the pilot study that the plant did not perform as well during high turbidity. Papania's recommendation was based upon prior tests which revealed a turbidity of less than 5 in the cooling pond. He believed that based upon lower turbidity, the cooling pond was a better source for water. Nebrig discussed the possibility of using the cooling pond rather than the triangle pond with Ben Gould[3] and Dean Reed.[4] Nebrig explained to them that the turbidity was lower in the cooling pond and that the cooling pond would be a better source of water for the UF system. Nebrig and Reed discussed the possibility of conducting a pilot study on the cooling pond, but there was simply not enough time to do so. WPT agreed to change the water source to the cooling pond.

After MPC and WPT agreed to change the water source to the cooling pond. Reed sent Nebrig's suggested specifications for process equipment, and recommended the use of the Koch membrane. Nebrig used Reed's suggestions in preparing the final specifications. On August 13, 1999, MPC issued Inquiry No. SS-BCC99-047 requesting bids for a water treatment system that

---

[1]Nebrig is employed by Southern Company Services, and was the Lead Engineer on the project.

[2]Whitley was the Manager of Compliance and Support at Plant Daniel.

[3]Gould was the Regional Sales Manager of Koch Membrane Systems. The WPT UF system was made with Koch membrane cartridges.

[4]Reed was the salesperson for WPT.

used the Koch membrane as a first stage ultrafilter and the cooling pond as the raw water source. The Inquiry required that "[t]he Bidder shall fully guarantee the performance of his system to attain the required effluent quality and quantity with the specified influent conditions." (Ex. J-9, § 1.1). On September 1, 1999, WPT submitted its proposal. After some revision, MPC awarded the contract[5] to WPT on September 22, 1999.

The contract required delivery of the system by March 15, 2000. Delivery of the system was late, however, and production began in November 2000. Initially, the quality of the water was acceptable, but the plant did not produce the requisite quantity. In January 2001, the UF system began to experience problems, which both MPC and WPT attempted to resolve. Pressure spikes caused damage to the UF cartridges, and then the UF membranes began to foul. After the membranes began to foul, the membranes needed more frequent cleaning than was required under the terms of the contract. MPC and WPT worked diligently in attempting to determine the cause of the problems with the UF system. Unfortunately, the efforts undertaken to resolve the problems did not repair the problems. The problems persisted, and the UF system continued to deteriorate. The working relationship of MPC and WPT deteriorated as well because of the parties' inability to resolve the problems with the UF system. In March 2001, because the UF system could not generate sufficient amounts of water, MPC began using the clarifier, which was MPC's old system, to supplement the UF system to meet its water demands.

On June 27, 2001, Nebrig requested that Netto provide a temporary mobile system, as provided in the contract, because the system was not producing the requisite quantity of water. On July 3, 2001, Netto responded that he would provide a mobile system, and that it would be delivered

---

[5]The parties dispute which documents comprise the contract. The Court will resolve this question below.

to Plant Daniel within two weeks. On July 6, 2001, Netto advised Nebrig that the feedwater provided by MPC did not comply with the analysis in the contract. On July 18, 2001, Netto revoked his prior offer to provide a temporary system. He advised Nebrig that until the feedwater was compliant with the raw water analysis in the contract and payment of the retainage was made to WPT, he would not provide the temporary mobile system. At this point, WPT left the Plant Daniel site.

In February 2001, Paul Lambert, a process engineer from Koch, the manufacturer of the UF membranes, went to Plant Daniel to assist with the problems associated with cleaning the membranes. The problems did not resolve, so in April 2001, Lambert began a pilot study on the cooling pond to determine if Koch could provide a system that would filter the water. The Koch pilot study continued through August 2001. Lambert observed that the transmembrane pressure was building too quickly. He concluded that the production system was operating successfully. He further concluded that the cause of the problem was feedwater quality. He recommended break tanks to reduce pressure spikes, but did not recommend reducing the pressure to the system. In his opinion, it was not economically feasible to clean the cooling pond water unless the system ran at half the output. In September 2001, Lambert moved the pilot study to the triangle pond. Lambert was ultimately able to obtain the desired output at the triangle pond.

Prior to WPT leaving the site, MPC requested assistance from two consultants, Puckorius & Associates and David H. Paul, Inc., to attempt to resolve the problems with the UF system. In March 2001, MPC hired Puckorius & Associates to determine the most probable cause of the fouling of the membranes. Puckorius submitted its preliminary report to Nebrig on April 19, 2001. In that report, Puckorius concluded that bacterial species in the feedwater was a likely cause of the fouling. Puckorius also suggested that the chlorine contact time prior to the UF may be too short to

effectively kill the bacteria.  At the time the Puckorius report was submitted to Nebrig, WPT was on-site at Plant Daniel attempting to resolve the problems with the UF system.  Nebrig did not, however, provide a copy of the Puckorius report to WPT.  In addition, MPC did not increase the chlorine contact time as suggested by the Puckorius report.

In July, MPC hired David H. Paul, Inc. ("DH Paul"), to analyze the problem.  Although DH Paul did not specifically determine what was fouling the membranes, it did determine that 76% of the foulant was inorganic and 24% was organic.  DH Paul also made numerous recommendations to MPC to implement on a step-by-step basis to determine whether the UF could filter the cooling pond water as designed.  According to David Paul,[6] if the UF system failed to work after implementing these recommendations, then MPC should look to other manufacturers to design a system that would work.  David Paul also recommended a pilot study and returning to the river water.  DH Paul did not analyze design issues to determine if the system was properly designed, but David Paul did note that nothing in the report concluded that the membranes were not right for this water.  David Paul emphasized that a pilot test on the specific water to be filtered is essential in designing such a system.  DH Paul's final report was submitted to MPC on July 27, 2001.

After MPC and WPT were unable to resolve the problems with the UF system but before WPT actually left the site, MPC lost confidence in the WPT system.  MPC therefore began looking at alternate systems to replace the WPT system.  On June 22, 2001, Zenon Environmental Systems, Inc., submitted a proposal to MPC for a UF system.  In October 2001, Zenon conducted pilot studies on both the triangle pond and the cooling pond.  After conducting the pilot study on the cooling pond, Zenon concluded that treatment of the cooling pond water was feasible, but the cost of

---

[6]David Paul is the founder and president of D. H. Paul, Inc.

treating the cooling pond water was estimated to be $300,000 or more than the cost of treating the triangle pond water.

April Corey, an employee of Southern Company Services, conducted a study to determine whether a UF system would perform better on the triangle pond than the cooling pond. After analyzing the Koch and Zenon pilot studies, Corey determined that both systems produced water similar in quality, but the Zenon system required less cleaning. Corey concluded that the Zenon system was better than the Koch system for RO pretreatment. After gathering and considering all the data from internal and external sources, MPC decided to purchase the Zenon system and change the water source to the triangle pond. Zenon offered to lease a temporary system to MPC until the permanent system was installed. MPC leased the Zenon temporary system beginning in April 2002, at a cost of $45,000 per month. MPC used the temporary system until the Zenon permanent system was installed in May 2004. Both the temporary and permanent Zenon systems used the triangle pond as a water source. MPC continued to use the WPT system, supplemented by the clarifier, until the temporary system was installed. After the permanent Zenon system was installed, MPC decommissioned the WPT system and moved it to storage.

As noted above, MPC filed its complaint against WPT on September 22, 2003, alleging breach of contract, breach of express warranty, breach of implied warranty of merchantability, and breach of implied warranty of fitness for a particular purpose. MPC seeks $3,295,843.29 in damages. Specifically, MPC claims that the WPT UF system[7] never performed to specification as provided in the contract because the system did not provide the quantity and quality of water as

---

[7]MPC purchased a three stage system from WPT, but only the first stage of that system, the UF, is the subject of the parties' claims. MPC continues to use the second and third stages of the WPT system.

specified in the contract.  In addition, MPC claims that WPT should have paid the costs associated with repairing and replacing the system based upon the system's failure to perform as warranted in the contract.  MPC also contends that WPT should have paid for the temporary system which was required because of the failure of the WPT system to perform to specification.  Lastly, MPC claims that it never accepted the WPT system because the system never performed to specification.

WPT denies that it breached the contract based upon the following:

1. WPT's performance under the contract was commercially impossible or impractical.

2. There was never a meeting of the minds between the parties.

3. WPT's performance is excused based upon the parties' mutual mistake.

4. MPC should be equitably estopped from denying the representations that it made in inducing WPT to provide performance guarantees.

5. MPC made intentional or negligent misrepresentations to WPT upon which WPT relied to its detriment.

Essentially, WPT claims that MPC breached the contract by failing to provide feedwater at the pressure required by the contract, and by failing to provide feedwater that met the characteristics as provided in the contract.  WPT also claims that MPC breached the contract because MPC accepted the system but failed to pay the full balance when due under the terms of the contract.  In addition, WPT claims that MPC breached the implied duty of good faith and fair dealing by failing to cooperate with WPT in finding a solution to problem.  WPT seeks damages in the amount of $1,356,678.29, plus interest, plus a prompt payment penalty on $229,791.34 at the rate of 1% per month from and after the date of the final judgment.

*The Contract:*

The parties dispute which documents comprise the contract.  As noted above, MPC issued Inquiry No. SS-BCC99-047 (Tr. Ex. J-9) requesting bids for a water treatment facility on August 13, 1999.  WPT submitted its bid, Proposal No. 440 by letter dated August 30, 1999, and by email dated September 1, 1999 (Tr. Ex. D-7).  By email (Tr. Ex. D-7) dated September 7, 1999, WPT provided data sheets to MPC (Tr. Ex. P-29A).  On September 13, 1999, MPC issued Revision 1 to Inquiry No. SS-BCC99-047 (Tr. Ex. J-12).  On September 16, 1999, WPT submitted Revision 2, which revised the bid price and the terms of payment in response to Revision 1 (Tr. Ex. P-31).  On September 17, 1999, WPT submitted Revision 1 to the Process Performance Guarantees (Tr. Ex. D-10).  On September 21, 1999, WPT submitted Revision 4, which revised its Revision 1 (Tr. Ex. J-14).  By letter dated September 22, 1999, MPC awarded the contract to WPT (Tr. Ex. J-15).  On November 11, 1999, MPC issued the Purchase Order (Tr. Ex. D-1).

Based upon the evidence and testimony, the Court finds that the following documents comprise the contract between the parties:

> a) Purchase Order (Tr. Ex. D-1);
>
> b) General Conditions of the Contract (Tr. Ex. J-11);
>
> c) Inquiry No. SS-BCC99-047 (Tr. Ex. J-12);
>
> d) Technical Specifications, (Tr. Ex. J-8);
>
> e) Vendor Deviation Request (Tr. Ex. J-10);
>
> f) Vendor Document Submittal Schedule (Tr. Ex. J-7);
>
> g) WPT's Proposal No. 440 (Tr. Ex. D-7) as revised by Revision 4 (Tr. Ex. J-14) and Revision 1 to the Performance Guarantees (Tr. Ex. J-13 at pp. —000521 - —000524);
>
> h) WPT's Data Sheets (Tr. Ex. P-29A).

MPC agrees that Revision 4 to the WPT Proposal, which revised the bid price and terms of

payment, is part of the contract.  MPC also agrees that the Revised Performance Guarantees are part of the contract.  MPC, however, denies that WPT's Proposal 440 (Tr. Ex. D-7) is part of the contract.  The Court is not persuaded.  These revisions were simply revisions to the proposal; WPT's proposal, as revised, remained part of the contract.

*The Salient Terms of the Contract:*

Section 3.1 of the Inquiry specified that the amount of effluent to be produced is 1376 GPM.  WPT's Proposal No. 440 is inconsistent in that one paragraph states that the UF system will provide 1376 GPM (Tr. Ex. D-7 at —000765 § 3.1.1), and another paragraph states that the UF system will provide 1013 GPM (Tr. Ex. D-7 at —000801 at § 2.1).  Nevertheless, the parties do not dispute  that the UF system was to produce 1376 GPM.  In addition, WPT's proposal states that untreated Pascagoula River water will be the influent, whereas MPC's Inquiry specified that untreated plant cooling lake water will be the influent.  The parties likewise do not dispute that they agreed to use untreated plant cooling lake water as the influent, as provided in MPC's Inquiry.  WPT Proposal also required that the influent must be provided "by others to the influent of the UF system at 60 PSIG."  (D-7 at M000801).  Although MPC disputes that this portion of WPT's Proposal is part of the contract, the Inquiry clearly states, and therefore MPC clearly agreed, that the influent would be provided at the pressure required by the Vendor (Tr. Ex. J-12 § 3.3.).  Consequently, the contract required MPC to provide influent as 60 PSIG.

Section 3.2.1 outlined the raw water analysis for the influent, which stated that the turbidity is 10-50 NTU; the TOC (total organic compound) is 14; the temperature is 50 - 95 degrees Fahrenheit; and the pH is approximately 6.5.

The contract provided the following warranty:

3.1 <u>Ultrafiltration System</u>

> WPT warrants that the ultrafiltration system as described in WPT proposal will provide the specified quantity and quality of filtered water under all specified system operations conditions at all times of the year and for a period of twelve (12) months from date of system acceptance by Mississippi Power (hereinafter Client) and to wit:
>
>> 3.1.1 <u>Quantity of Filtered Water</u>
>> WPT warrants that the ultrafiltration system will deliver, upon demand, a minimum instantaneous filtered water (product) flowrate of 1376 GPM or 1,981,440 gallons of specified quality water within any 24 hour period.

(Tr. Ex. J-13 at —000521).  The contract further provided the following remedies:

> 3.1.5 <u>Customer Remedies</u>
>
>> 3.1.5.1 <u>UF Element Replacement</u> (Per Rev. 1).
>>
>> If the UF system fails to produce the specified quantity or quality of filtered water as enumerated per 3.1.1, 3.1.2 and/or 3.1.3 above, within twelve (12) months of the date of system acceptance by Client, WPT will, upon proper notification, make necessary repairs or component replacements at WPT's sole discretion and at no additional cost to Client. . . .
>>
>> 3.1.5.2 <u>Temporary Mobile Water Treatment Equipment</u> (Per Rev.1).
>> In addition to remedies described per 3.1.5.1 above, WPT will, in the event that the UF system cannot produce the guaranteed system capacity, provide any temporary mobile water treating equipment as may be required to insure guaranteed system capacity for a maximum period of twelve (12) months from date of system acceptance by Client.  (Per Rev 1).

(Tr. Ex. J-13 at —000521 - —000522).

The contract also required MPC to pay a 10% retainage "upon successful startup, but not to exceed 120 days from the date of last major component shipment." (Tr. Ex. J-11 at W&PT-000429).  The contract further provided as follows:

> Final acceptance shall be determined by Company.  Should such final acceptance not be made within one hundred twenty (120) days after receipt of the Equipment at Company's designated destination point, for reasons other than the grounds set forth in Paragraph 21.1.2, then Company will pay Supplier an interest charge on the retained amount, at the average prime interest rate during such period beyond said one hundred twenty (120) days that the retained amount is withheld.

(Tr. Ex. J-11 at W&PT-00429).

BREACH OF CONTRACT CLAIMS:

MPC and WPT have asserted claims of breach of contract against each other. Under Mississippi law, "[t]he elements of a breach of contract are: (1) the existence of a valid and binding contract; (2) that the defendant has broken, or breached it; and (3) that the plaintiff has been thereby damaged monetarily." *Favre Prop. Mgmt., LLC v. Cinque Bambini,* 863 So.2d 1037, 1044 (Miss. Ct. App. 2004), *citing Warwick v. Matheney,* 603 So.2d 330, 336 (Miss. 1992). The parties do not dispute the existence of a valid and binding contract. Therefore, the Court must first determine whether the contract was breached, and by which party.

*Was the contract breached, and if so, by whom?*

MPC contends that WPT breached the contract by failing to produce the required amounts of water as provided in the contract. WPT defends its failure to meet the requirements of the contract by claiming that MPC failed to provide influent at the pressure and of the character required by the contract. Under Mississippi law, "[a]s a general rule, a party to a contract may break it by renouncing his liabilities under it; by rendering performance impossible; or by totally or partially failing to perform his agreement or undertaking." *Matheney v. McClain*, 161 So.2d 516, 519 (Miss. 1964). "When either party to a contract fails to perform any of his terms, the contract has been broken." *Matheney*, 161 So.2d at 519-20 (citation omitted). "[A] party's material breach of a bilateral contract excuses further performance by the other party." *Cinque Bambini*, 863 So.2d at 1044, *citing Gulf South Capital Corp. v. Brown,* 183 So.2d 802, 804-05 (Miss.1966). Mississippi law is well established that termination of a contract is an "extreme remedy" and will only be allowed for a material breach. "A breach is material when there 'is a failure to perform a substantial part of the contract or one or more of its essential terms or conditions, or if there is such a breach as substantially defeats its purpose,' or when 'the breach of the contract is such that upon a reasonable

construction of the contract, it is shown that the parties considered the breach as vital to the existence of the contract.'" *UHS-Qualicare, Inc. v. Gulf Coast Cmty. Hosp., Inc.*, 525 So.2d 746, 756 (Miss. 1987). "The issue of whether a breach was material is a question of fact." *Cinque Bambini*, at 1044, *citing UHS-Qualicare, Inc.,* 525 So.2d at 756 (Miss. 1987).

The contract required MPC to provide influent at 60 PSI. MPC admittedly did not provide influent at 60 PSI. In addition, the raw water analysis provided by MPC in the contract for the cooling pond was not an actual analysis of the cooling pond. The analysis was essentially an estimate by Nebrig of what he believed to be the makeup of the cooling pond water. It is undisputed that the cooling pond was harder to treat than the triangle pond; that the cooling pond was materially different than the triangle pond; and that the characteristics of the raw water analysis in the contract was not consistent with the water in the cooling pond. Based upon MPC's failure to provide influent of the character and at the pressure required by the contract, MPC breached the contract. MPC's breach was material because MPC's duty to provide the influent was an essential term of the contract. WPT required MPC's influent, of the character and at the pressure provided in the contract, to produce 1376 GPM as required by the contract. Because MPC's breach was material, WPT was excused from further performance of its obligations under the contract.

<u>To What Damages is WPT Entitled?</u>

WPT seeks as consequential damages and the balance of the contract price plus interest and prompt payment penalties. Specifically, WPT contends that it is entitled to the balance of the

contract price in the amount of $206,820;[8] shipping costs in the amount of $22,971.34;[9] prejudgment interest on the balance of the contract price and additional shipping costs in the amount of $58,857.04; prompt payment penalties in the amount of $167,693.59; and costs for materials, labor and expenses in attempting to resolve the problems with the UF system in the amount of $746,938.25; prejudgment interest on the materials, labor, and expenses in the amount of $153,397.98; and post-judgment interest.

     MPC, on the other hand, contends that WPT's recovery is limited to the balance of the contract price. MPC contends that WPT is not entitled to recover materials, labor and expenses because the personnel provided by WPT lacked the necessary qualifications to resolve the problems with the UF system. In addition, MPC contends that it did not authorize these expenses. Moreover, MPC claims that WPT warranted the system for one year of continuous service.

     The standard for measuring contract damages under Mississippi law is as follows:

> The court's purpose in establishing a measure of damages for breach of contract is to put the injured party in the position where she would have been but for the breach. Contract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of the bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed.

*Frierson v. Delta Outdoor, Inc.*, 794 So.2d 220, 225 (Miss. 2001), *quoting Theobald v. Nosser,* 752 So.2d 1036, 1042 (Miss.1999) (other citations omitted). Clearly, WPT is entitled to the 10% retainage and shipping costs as provided in the contract. MPC would have paid these costs to WPT

---

[8] This figure represents the 10% retainage in the amount of $198,720.00, plus $8,100 for Change Order #1. WPT submitted an invoice to MPC dated November 21, 2000, for the payment of these items.

[9] In the contract, MPC agreed to pay the freight charges. (Tr. Ex. J-11 at W&PT-00429 § 20.0). WPT submitted an invoice to MPC dated January 10, 2001, for the payment of these charges.

14

had the contract been performed.

WPT also seeks interest on the retainage and shipping costs.  The contract clearly provides that WPT is entitled to interest on the retainage, "at the average prime interest rate during such period beyond said one hundred twenty (120) days that the retained amount is withheld."  (Tr. Ex. J-11 § 21.1).  Thus, WPT is entitled to recover interest on the retainage.  The contract does not state that WPT is entitled to interest on shipping costs.  Mississippi law generally allows an award of prejudgment interest where the claim is liquidated.  *Benchmark Health Care Center, Inc. v. Cain*, 912 So.2d 175, 183 (Miss. Ct. App. 2005).  "Damages being 'liquidated' refers to damages that are set or determined by a contract when a breach occurs." *Cain*, 912 So.2d at 183, *quoting Moeller v. Am. Guar. and Liab. Ins. Co.,* 812 So.2d 953, 959-60 (¶ 18) (Miss. 2002) (citing Black's Law Dictionary 395 (7th ed. 1999)). Because the amount of shipping costs was liquidated, and MPC was clearly required to pay shipping costs under the terms of the contract, the Court finds that WPT is entitled to interest on the shipping costs.

WPT also claims that it is entitled to the prompt payment penalty as provided in MISS. CODE ANN. § 87-7-3.  Section 87-7-3 provides as follows:

> All sums due contractors under all construction contracts, except public construction contracts, shall be paid as follows:
> . . . .
>
> >   (b) Final payments: The final payment of all monies owed contractors shall be due and payable:
> >
> >   (I) At the completion of the project or after the work has been substantially completed in accordance with the terms and provisions of the contract;
>
> If the contractor is not paid in full within sixty (60) calendar days from the first occurrence of one (1) of the above-mentioned events, then the final payment shall bear interest from the date of such first occurrence at the rate of one percent (1%) per month until fully paid.

MISS. CODE ANN. § 87-7-3.[10]  In this case, MPC failed to pay the retainage and shipping costs as required by the contract terms.  Therefore, WPT is entitled to recover the prompt payment penalty.

WPT also seeks to recover materials, labor and travel expenses that it incurred in attempting to resolve the problems with the UF.  The contract, however, did not require WPT to incur the expenses.  When MPC failed to provide the influent at the specified pressure and of the specified character, WPT was relieved from performing its duties under the contract.  WPT voluntarily chose to attempt to resolve the problems.  Because the contract did not provide for the recovery of these expenses, WPT may not recover the expenses for materials, labor and travel expenses.

*MPC's Claims Against WPT:*

MPC asserted claims of breach of contract against WPT.  Under Mississippi law, "a party who has breached a contract may not . . . maintain a suit for breach of the contract against the other party."  *Smith*, 610 So.2d at 361-62 (Miss. 1992) (citations omitted).  Because MPC breached the contract by failing to provide influent according to the terms of the contract, MPC cannot maintain its claims for breach of contract against WPT.  These claims must therefore be dismissed with prejudice.

---

[10]Section 87-7-3 was amended on July 1, 2006.  The amendment substituted 30 days in place of 60 days.  Because the 60 day provision was in effect during the time that the retainage and shipping costs became payable, the 60 day provision applies in this case.

CONCLUSION

It is the opinion of the Court that WPT has established that MPC materially breached the contract by failing to provide influent according to the provisions of the contract.  In addition, WPT has established that it is entitled to damages in the amount of $288,648.38, plus a penalty pursuant to MISS. CODE ANN. § 87-7-3, in the amount of $167,693.59.   Based upon MPC's material breach of the contract terms, MPC cannot maintain its claims for breach of contract against WPT.

**IT IS THEREFORE ORDERED AND ADJUDGED,** that for the reasons stated herein, the Defendant is entitled to recover from Plaintiff damages in the amount of $288,648.38, plus a penalty pursuant to MISS. CODE ANN. § 87-7-3, in the amount of $167,693.59.  In addition, the Defendant is entitled to recover future prompt payment penalties under § 87-7-3 on the balance of $229,791.34 at the rate of one percent per month from the date of final judgment until paid in full.

**IT IS FURTHER ORDERED AND ADJUDGED**, that for the reasons stated herein, the Plaintiff's claims against the Defendant should be and are hereby **DISMISSED WITH PREJUDICE.**  The Court shall enter a separate judgment pursuant to FED. R. CIV. P. 58.

**SO ORDERED AND ADJUDGED** this the 24th day of November, 2006.

s/ *Louis Guirola, Jr.*
LOUIS GUIROLA, JR.
UNITED STATES DISTRICT JUDGE